IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
OCTOBER 24, 2006 Session

## RISA STOCK v. MORRIS STOCK

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-007329-02      Jerry Stokes, Judge**

_____

**No. W2005-02634-COA-R3-CV - December 28, 2006**

_____

This appeal involves a trial court's distribution of marital property in a divorce proceeding. The parties owned their own business, and the husband generally ran its operations while the wife handled its financial aspects. After the business caught fire, the husband found $240,000 in the company safe. He took the money to a bank and placed it in a safety deposit box. The company's head of security accompanied the husband to the bank and testified about these events at trial. The wife also had access to the box, and the bank records revealed that she accessed it over thirty times in the next five years. The husband and the security officer returned to the safety deposit box when he learned that the wife intended to file for divorce, but there was no cash remaining in the box. The trial court determined that the wife had dissipated the marital estate in the amount of $240,000 and subtracted half that amount, $120,000, from her award of the marital property. The wife appealed. For the following reasons, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Patricia Chafetz, T. Tarry Beasley, II, and Timothy A. Perkins, Memphis, TN, for Appellant

Mitchell D. Moskovitz and Adam N. Cohen, Memphis, TN, for Appellee

**OPINION**

## I.  FACTS & PROCEDURAL HISTORY

Risa Stock ("Wife") married Morris Stock ("Husband") in 1984.[1]  When they married, Wife was 19 years old, and Husband was 28 years old.  Husband had been working in the iron and scrap metal business for Lazarov Brothers since 1980.  Neither party has a college degree.  In 1991, Husband and Wife formed a corporation and purchased Husband's employer's business.  They renamed the business Airways Iron and Metal Company ("AIMCO").   Husband was in charge of AIMCO, but Wife handled the company's financial duties such as paying expenses, providing information to their accountant, and handling insurance matters and the company payroll.  AIMCO is predominately a cash business.

Mr. Harold Wormser has been the company's accountant since the second year of AIMCO's operation.  He would prepare the monthly books, corporate income tax returns, and payroll tax returns based on the statements and data that Wife would provide each month.  According to Mr. Wormser, he frequently had to prepare a reconciliation of the "cash on hand" reports.  In other words, the "cash on hand" reported by Wife was far less than the amount of cash that AIMCO should have had on hand each month, and Mr. Wormser would have to adjust his figures to account for the discrepancy.  During some years, Mr. Wormser's adjustments would exceed $50,000 annually.

In 1997, a major fire broke out at AIMCO.  Apparently the only asset that was not destroyed in the fire was a safe, but the dial had burned off.  Husband had a lock company open the safe, and at that time he discovered a large amount of cash inside a separate compartment in the safe.  According to Husband, he put the money into a duffle bag and took it to a bank where he opened a safety deposit box in both parties' names.  Sergeant Marvin Townsend of the Memphis Police Department is employed part-time by AIMCO to provide security for the premises, and he testified that he accompanied Husband in taking the bag of money to the bank.  Husband claimed that he counted the cash when he placed it into the safety deposit box, and it totaled $240,000.  Sergeant Townsend testified that he observed Mr. Stock's bag of money, and he did not know how much money there was, "but it was a lot of it."

The safety deposit box's admission record reflects that the box was first opened on November 26, 1997.  Husband's signature is dated 11/26/97.[2]  The admission record displays 33

---

[1] The parties had three children – Isaac, Rachael, and Benjamin.

[2] Wife testified that *she* had accompanied Husband to the bank when he opened the safety deposit box, not Sergeant Townsend.  On the box's admission record, Husband's signature is located on the first line in the first column under "access signatures" and marked "11/26/97 8:30."  There are two columns on each card separated by a bold line.  Wife emphasized that her signature on the first line of the second column across from Husband's signature was also marked "8:30."  There is no date next to Wife's signature, but not all entries have both dates and times.  However, Husband's and Wife's signatures were initialed by different clerks.  Also, for all of the other visits the signatures were

(continued...)

subsequent entries signed by Wife when she accessed the safety deposit box between 1997 and 2002. According to Husband, Wife would tell him she was going to the box to put more cash into it.

The parties separated on or about December 23, 2002. Wife accessed their safety deposit box on December 26, 2002. According to the admission record and Husband's testimony, Husband only returned to the safety deposit box on December 30, 2002. He had not accessed the box since he had first opened it in 1997. Sergeant Townsend claimed that he had been urging Husband to go to the box to be sure the money was still there, and he testified that he again accompanied Husband to the bank on this second visit. Both Husband and Sergeant Townsend explained that there was no cash in the safety deposit box when Husband opened it. Wife acknowledged that she had opened her own safety deposit box at another bank on or around December 26, but she insisted that she had only removed her jewelry from the other box.

Wife filed a complaint for legal separation on December 31, 2002, in the Circuit Court of Shelby County, and she filed an amended complaint for an absolute divorce on April 1, 2003. Husband moved the trial court to require a third-party to pay AIMCO's business expenses and to enjoin Wife from interfering with its business operations. He alleged that Wife had depleted significant amounts of cash from the business and requested that Mr. Wormser, the accountant, be appointed to handle AIMCO's financial duties. Attached to Husband's motion were the affidavits of Mr. Wormser, Sergeant Townsend, and an AIMCO employee, Elijah Williams. Mr. Wormser expressed his willingness to handle AIMCO's finances. Sergeant Townsend explained the details of his two trips to the bank with Husband and the bag of money. Elijah Williams stated that during the latter part of 2002, he observed Wife at her desk at AIMCO with "significant amounts of cash," which she referred to as "her 'life's savings.'" The court granted Husband's motion on July 8, 2003, delegating the responsibility for paying AIMCO's expenses to Mr. Wormser. After Mr. Wormser took over, Wife no longer worked at AIMCO. Two years later, Mr. Wormser testified that since he had taken over the company's financial operations in July of 2003, AIMCO had "cash on hand" overages in amounts ranging from $500 to $1500 per month. Based on Mr. Wormser's knowledge of AIMCO's financial situation, he could think of no other source for the $240,000 cash in the safe other than the cash shortages that he had previously detected each month.

The trial court entered a final decree of absolute divorce on September 7, 2005. In dividing the marital property, the court awarded all right, title, and interest in AIMCO to Husband. The court valued the business at $437,000. Wife was then awarded one-half the value of the business, or $218,500, for her interest in the company. However, both parties had borrowed money from AIMCO during the course of the divorce proceedings, and Mr. Wormser calculated the total amounts owed by the parties to be $23,412 by Wife and $15,937 by Husband. The trial court recognized the parties' loans and subtracted the amount Wife owed to AIMCO from her interest in the company. In addition, the trial court found that Wife had dissipated the marital estate in the amount of $240,000. The judge subtracted half that amount, $120,000, from the award representing her interest

---

[2](...continued)
placed vertically in the columns, just below the preceding signature according to date.

in the business. In sum, Husband was ordered to pay Wife $75,088 as alimony *in solido* for her interest in AIMCO. ($218,500 interest – $23,412 debt – $120,000 dissipation = $75,088).

The court distributed the remainder of the marital property and debts, and also ordered Husband to pay Wife $4000 per month in rehabilitative alimony for five years, $1700 per month in child support, and $25,000 toward Wife's attorney's fees. Wife filed a motion to alter or amend the judgment on September 12, 2005, which was addressed by order on October 12, 2005. Wife filed her notice of appeal on November 14, 2005.

## II. ISSUES PRESENTED

Appellant has timely filed her notice of appeal and presents the following issues, as we perceive them, for our review:

1. Whether the trial court erred in finding that Wife dissipated the marital estate when Husband presented no evidence showing how Wife allegedly spent the dissipated funds;
2. Whether the trial court failed to effectuate an equitable distribution of the marital estate because the majority of the assets were awarded to the party with a higher earning potential;
3. Whether the trial court erred in dividing marital debts because the court focused solely on the party who incurred the debt.

Additionally, Appellee presents the following issues for review:

4. Whether Wife has waived her right to contest the marital property division by failing to adhere to Rule 7 of the Rules of the Court of Appeals of Tennessee.
5. Whether Husband should be awarded his reasonable and necessary attorney fees related to this appeal.

For the following reasons, we affirm the decision of the circuit court. In addition, we decline to award attorney's fees to Appellee.

## III. STANDARD OF REVIEW

This Court reviews findings of fact by a trial court sitting without a jury under a *de novo* standard with a presumption of correctness for those findings. Tenn. R. App. P. 13(d) (2006). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness for the trial court's conclusions. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A. Equitable Division of the Marital Property

#### 1. Dissipation and the $120,000 credited against Wife's share

On appeal, Wife contends that Husband did not prove she dissipated an asset because he has no proof that the cash existed in the first place, or at least no proof as to how much cash he placed in the box, and he did not specifically allege how she had spent the missing funds. In discussing its finding that Wife had dissipated the marital estate, the trial court gave the following explanation from the bench:

> Her figure[] has to be adjusted based upon hearing it from Mr. Stock as well as hearing it – hearing testimony of Marvin Townsend, an employee of the Airways Iron and Metal, as well as a police officer of some 31 years.
>
> The Court finds that there has been a dissipation of marital assets by the wife in the amount of $240,000 somewhere during the period of 1997 through December 2002. The Court heard the testimony, weighed the credibility of the parties, and hearing from Mr. Townsend who indicated that sometime . . . Mr. Stock carried a large bag to the safety deposit box. And Mr. Stock has indicated that the bag was not just a regular bag, but a duffle bag or a gym bag.
>
> That bag contained $240,000. Mr. Townsend didn't count the money. He did see the money. He doesn't know how much was in there, but Mr. Stock indicated that he did, in fact, count it. As a result, because of the dissipation of $240,000, half of which would have belonged to Mr. Stock, Ms. Stock's $195,088 is hereby reduced by $120,000 to an amount of $75,088.

From this discussion, it appears that the trial court treated the $240,000 in cash as a marital asset subject to division between the parties.

The Supreme Court of Tennessee faced a similar situation in *Flannary v. Flannary*, 121 S.W.3d 647 (Tenn. 2003) in the context of a divorce. A husband had withdrawn approximately $48,000 from the parties' savings account in response to the Y2K scare and placed it into his bedroom drawer. *Id.* at 649. When he went to re-deposit the money in January of 2000, it had disappeared. *Id.* When the husband later filed for divorce, both parties disclaimed any responsibility for the money's disappearance. *Id.* The trial court found insufficient evidence to determine what really happened to the money, but it noted that the husband was in control of the money when it was withdrawn, and he should have known better than to put it into a drawer. *Id.* The court proceeded to divide the money like any other marital property and awarded the wife a judgment for $24,000, half the missing funds. *Id.* The Supreme Court determined that because the funds were missing when the divorce complaint was filed, the funds were not marital property subject to division. *Id.*

at 650. However, the Court found that the husband's careless handling of the funds could be considered in distributing the other property that was classified as marital. *Id.* at 651. In dividing property, a trial court is instructed to consider "[t]he contribution of each party to the acquisition, *preservation*, appreciation, *depreciation or dissipation* of the marital or separate property" and "[s]uch other factors as are necessary to consider the equities between the parties." *Id.* (citing Tenn. Code Ann. § 36-4-121(c)(5),(11) (2001)) (emphasis added). The Court noted that the husband's actions could been seen as a "failure to preserve a marital asset" under the statute. *Id.* Therefore, the Court remanded the case to allow the trial court to consider the relevance of the husband's careless conduct with regard to the ultimate disappearance of the funds. *Id.*

In this case, Husband and Sergeant Townsend returned to the safety deposit box on December 30, 2002, and both testified that the cash was missing on that date. Wife filed her complaint for legal separation on December 31, 2002. As such, the $240,000 "asset" would not be considered marital property subject to division. In Tennessee, marital property is defined as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing *and owned by either or both spouses as of the date of filing of a complaint for divorce . . . .*" Tenn. Code Ann. §36-4-121(b)(1)(A) (2005) (emphasis added). Because both parties maintained that the money was not in their possession, the $240,000 should not have been divided as marital property. Still, this conclusion does not end our inquiry. "In the final analysis, the appropriateness of the trial court's division depends on its results." *Altman v. Altman*, 181 S.W.3d 676, 683 (Tenn. Ct. App. 2005) (citing *Bolin v. Bolin*, 99 S.W.3d 102, 107 (Tenn. Ct. App. 2002); *Watters v. Watters*, 959 S.W.2d 585, 591 (Tenn. Ct. App. 1997)). The trial court's distribution of marital property may still be affirmed if it was equitable. *See id.* at 681 (where a trial court's finding of dissipation was error, but its division of the marital estate was affirmed as being equitable).

## 2. The trial court's division of marital property

In dividing the marital property, the trial court awarded the parties' house to Husband. Although the trial court did not specifically assign a value to the house, the parties estimated it to be worth about $111,000.[3] In addition, Husband was to retain his 2002 Ford F-350, a 1993 Harley

[3] We note that Wife's brief contains three charts allegedly setting forth the values of several assets distributed by the trial court. Her chart does not contain any citations to the record directing us to where these values were determined, but she explains that the figures were taken "from the testimony of the parties at trial" and their memoranda. From Husband's brief and its chart, we have learned that the parties had disputed most of the assets' values, and Wife's brief does not include Husband's proposed values. There is only a footnote to her chart indicating that Husband had disputed the value of one of the figures.

Rule 7 of the Rules of the Court of Appeals instructs the parties to attach a chart displaying the values proposed by both parties, and any values found by the trial court. The Rule also provides that "[e]ach entry in the table *must include a citation to the record* where each party's evidence regarding the classification or valuation of the property or debt can be found . . . ." (emphasis added). We have previously held that "where an appellant fails to comply with this rule, that appellant waives all such issues relating to the rule's requirements." *Howell v. Howell*, No. W2001-01167-COA-R3-CV, slip op. at 4 (Tenn. Ct. App. W.S. Aug. 15, 2002) (citing *Bean v. Bean*, 40 S.W.3d 52 (continued...)

Davidson motorcycle, a Six-wheeler, a trailer, a 1996 Dodge Ram titled in Husband's name but driven by their adult son, and a leased 2005 Chevrolet Tahoe driven by the parties' daughter. Wife was to retain her leased 2005 Cadillac Escalade.

The parties also had an escrow account containing funds from the sale of their previous home. It appears that each party had received $55,000 in disbursements from the account during the course of the divorce proceedings. Of the remaining balance of $207,721, Husband was awarded $50,000 and Wife received $157,721. Husband retained his gun collection which the parties had estimated to be worth between $4800 and $6100. Wife retained several items of jewelry with an estimated value of $12,150. Husband and Wife kept their respective IRA accounts; Husband's was worth $23,632 and Wife's had been worth $11,105.78 earlier in the proceedings, but she had withdrawn approximately $10,000 from the account since that time. In addition, the parties were to keep all household furnishings in their possession, and each was to retain the bank accounts in their respective names.[4] Husband was also allowed to retain some exotic animals that were on the premises of AIMCO, including a camel, a llama, an alpaca, an ostrich, watusi cattle, two horses, and a pony. The AIMCO emblem displays a camel, and Husband explained that customers and their children come to see them. Wife also acknowledged that AIMCO is recognized for having the animals.

The trial court specifically found that AIMCO was worth $437,000, and Husband was awarded all right, title, and interest to the business. The trial court awarded Wife one-half of that amount, $218,500, but then subtracted $120,000 off of her share because she had "dissipated" the marital estate by removing the funds from the safety deposit box. In the end, Wife's interest in the business was valued at $98,500.[5]

There were also marital debts assigned to each party. Husband had a loan from AIMCO of $15,937, and was ordered to pay a $3,049 Haverty's Furniture bill, a Fleet Visa card balance of $10,380, and guardian ad litem fees of $4,506.[6] The total amount of marital debt assigned to

---

[3](...continued)
(Tenn. Ct. App. 2000)). However, we will proceed with our review of the trial court's distribution using the values and references cited in Husband's chart.

[4] The trial court did not assign a value to the household furnishings distributed to each party, and it did not state the balances of the bank accounts each party was to retain. In the parties' briefs, they have only listed approximately 13 items of marital property that the court divided between the parties such as the house, vehicles, and IRA's, but neither party mentions the bank accounts or household furnishings awarded to either party or their values.

[5] This award was labeled alimony *in solido* by the trial court, but the court then noted that Husband was ordered to pay that amount "for Wife's interest in [AIMCO]." We believe the award is more properly characterized as a division of marital property rather than alimony, and we will treat it as such in our analysis. *See Duncan v. Duncan*, 652 S.W.2d 913, 915 (Tenn. Ct. App. 1983).

[6] Husband was also required to pay $25,000 of Wife's attorney's fees as alimony *in solido*.

Husband was $33,872. Wife was required to pay back her loan from AIMCO of $23,412 and various other debts, mostly credit cards, of $37,042.[7] The total debt assigned to Wife equaled $60,454.

We begin by noting that trial courts have wide discretion in distributing marital property, and their decisions are given great weight on appeal. *Dellinger v. Dellinger*, 958 S.W.2d 778, 780 (Tenn. Ct. App. 1997). The trial court's decision will be presumed correct unless the evidence preponderates otherwise. *Id.*; Tenn. R. App. P. 13(d). An equitable property division is not achieved by a mechanical application of the statutory factors, but rather by considering and weighing the most relevant factors in light of the facts of each case. *Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003) (citing *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988)). Some factors may be significant in reaching an equitable division, and others' importance may be diminished depending on the unique facts of a case. *See Cronin-Wright v. Wright*, 121 S.W.3d 673, 675 (Tenn. Ct. App. 2003). A division of marital property is not rendered inequitable merely because it is not precisely equal. *Kinard v. Kinard*, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998). (citing *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988)). Based on our review of the record, we have concluded that the trial court's division of marital property was equitable.

On appeal, we give great weight to a trial court's findings involving witnesses' credibility because the trial court is in a better position to weigh and evaluate credibility. *Broadbent v. Broadbent*, No. M2003-00583-SC-R11CV, slip op. at 3 (Tenn. Oct. 19, 2006) (citing *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). In this case, the trial judge specifically stated that he had weighed the credibility of the parties in concluding that the $240,000 was, in fact, placed in the safety deposit box and that Wife had "dissipated" the cash sometime before the complaint was filed. This factual finding is entitled to a presumption of correctness on appeal. *See* Tenn. R. App. P. 13(d) (2006). Upon reviewing the testimony of Wife, Husband, Sergeant Townsend, Elijah Williams, and Mr. Wormser, we find sufficient evidence to support the trial court's conclusion that the $240,000 did exist and that Wife was responsible for its disappearance. Just as in *Flannary*, Wife's conduct could be characterized as "failing to preserve a marital asset," and it is clearly relevant to the division of the remaining marital property.[8] *See* Tenn. Code Ann. § 36-4-121(c)(5)

---

[7] Specifically, the debts assigned to Wife included a Chase/Bank One balance of $11,562, a Bank Tennessee loan of $3182, a $330 J.C. Penney bill, a Household Finance bill of $5900, a Target card balance of $134, a Best Buy balance of $1757, a Value City Furniture balance of $2541, a Nordstrom card balance of $3166, a Dell card bill of $1943, a Macy's card balance of $1180, a Sears Mastercard with a $1967 balance, a Royal Furniture balance of $3290, bills from Banana Republic, Express, Victoria's Secret, and a personal loan.

[8] We note that in *Flannary*, our Supreme Court found it appropriate to remand the case to the trial court for a reevaluation of its previous property division and alimony determinations in light of the Court's finding that the missing money was not a marital asset subject to division. 121 S.W.3d at 651. The trial court in that case had originally concluded that there was insufficient evidence to determine what happened to the money, but it found that the husband's careless decision to put the money into a drawer led to its ultimate disappearance. *Id* at 649. Therefore, a remand was necessary in order for the court to consider the relevance of the husband's behavior with regard to the missing funds. *Id.* at 651. To the contrary, in this case the trial court explicitly found that Wife was responsible for taking the missing

(continued...)

(2005) (instructing a trial court to consider a party's contribution to the preservation, depreciation, or dissipation of the marital property). "Preservation" has been defined as "maintenance . . . not the creation, but the saving of that which already exists . . . ." *Flannary*, 121 S.W.3d at 651 (citing *Black's Law Dictionary*, 1184-85 (6th ed. 1990)). At the very least, Wife's conduct could properly be considered as affecting the equities between the parties. *See* Tenn. Code Ann. § 36-4-121(c)(11) (2005). Besides AIMCO itself, which was valued at $437,000, the money in the safety deposit box would have been the parties' largest marital asset.

Also relevant to the parties' contributions to the preservation of the estate is the fact that for nearly two years during the divorce proceedings, Husband paid a large share of the parties' bills. The parties entered a consent order on October 1, 2003, in which Husband agreed to pay the insurance, taxes, and note on their house, health insurance for Wife and the children, the cable bill, utilities, telephone bill, automobile insurance on all vehicles, Wife's car note, home security and pest control expenses. The parties split the cost of the children's medical, counseling, and dental bills that were not paid by insurance, and the children's tuition, groceries, and haircuts. Wife agreed to pay for storage unit costs and the monthly minimum payments on three credit cards. During this time, Wife did not work at AIMCO because Mr. Wormser was handling the company's financial duties.[9] However, Wife continued to receive her annual salary from AIMCO of over $77,000 per year.

The parties' age, physical, and mental health is also relevant to the distribution of their marital property. *See* Tenn. Code Ann. § 36-4-121(c)(2) (2005). When the trial court divided the property, Wife was 40 years old and Husband was 49. They had been married for 18 years when Wife filed for divorce. Both parties had previously visited counselors. Wife testified that she was in good health and exercised about five to seven days per week. Husband had developed lung cancer in 2002 and had surgery to move a lobe of one of his lungs. He needed annual appointments with his surgeon thereafter.

Regarding vocational skills, employability and earning capacity, Tenn. Code Ann. § 36-4-121(c)(5) (2005), neither party had a college education. After their divorce, Husband would continue to operate AIMCO, and Wife had begun taking classes to attend nursing school.[10]

---

[8](...continued) money from the box. We do not find it necessary to order a remand because the trial court has already determined that Wife took the cash from the safety deposit box, and we can consider that fact in determining whether the trial court's division of property was equitable.

[9] For the most part, Wife did not work while the divorce was pending. Wife did have three different part-time jobs during the proceedings. First, she worked at a fitness facility for 4-5 hours per week for a couple of months. Then, she worked at a café for a couple of days. And finally, she worked 15-20 hours per week at a law firm from October to December of 2004.

[10] Husband was ordered to pay Wife rehabilitative alimony for the next five years.

The parties' separate property may also be considered. It appears that Husband had no separate property, and Wife's separate property consisted of certain items of jewelry with an estimated value of nearly $20,000.

"Marital debts" are all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing. *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). In dividing a couple's marital debts, a trial court should consider four factors in reaching an equitable distribution: (i) the debt's purpose; (ii) which party incurred the debt; (iii) which party benefitted from incurring the debt; and (iv) which party is best able to repay the debt. *Id.* at 814. By carefully considering these factors, the spouse who did not incur the debt will be protected from bearing responsibility for debts that are the result of personal excesses of the other spouse. *Id.* In this case, a review of the factors supports the trial court's decision to allocate more of the debt to Wife. At trial, Wife acknowledged that when her deposition was taken earlier in the proceedings, she only had a Fleet Visa balance and the Haverty's furniture bill. These two bills were allocated to Husband when the court divided the marital debts. Wife had accumulated all of the other loans and credit card balances since the parties separated. Although they would be classified as marital debts, Wife incurred these debts individually for her own purposes, and she benefitted from the debts, not Husband. Keeping in mind that Wife was not working during that time but was still receiving her $77,000 annual salary, she received $55,000 in distributions from the parties' escrow account, and withdrew $10,000 from her IRA, we agree that the debts Wife incurred post-separation were properly allocated to Wife.

In sum, we find that the evidence supports the trial court's distribution of the parties' marital property. Although the $240,000 missing from the safety deposit box was not a marital asset subject to division, the trial court specifically found that Wife was responsible for the money's disappearance, and that fact is to be considered in the distribution of the remaining marital property. After a consideration of the statutory factors, we believe the evidence provides a sufficient basis for awarding Husband a larger share of the marital estate.

### B. Attorney's fees on Appeal

Husband has requested attorney's fees on appeal. When determining whether to award attorney's fees on appeal, we consider the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, and any other equitable factor that need be considered. *Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, slip op. at 11 (Tenn. Ct. App. W.S. Sept. 3, 2003) (citing *Folk v. Folk*, 210 Tenn. 367, 357 S.W.2d 828, 829 (Tenn. 1962)). In this case, we find it equitable to decline to award Appellee attorney's fees on appeal.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court. Further, we decline to award attorney's fees to Appellee. Costs of this appeal are taxed to Appellant, Risa Stock, and her surety, for which execution may issue if necessary.

 

_____

ALAN E. HIGHERS, JUDGE